UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **INSURANCE DISTRIBUTION CONSULTING, LLC,** § | | |
| Plaintiff, § | | |
| § | | |
| vs. § | **CIVIL ACTION NO. _____** | |
| § | **JURY DEMANDED** | |
| § | | |
| **FIDELITY & GUARANTY LIFE INSURANCE COMPANY,** § | | |
| Defendant. § | | |

## PLAINTIFF'S COMPLAINT

COMES NOW, Plaintiff, INSURANCE DISTRIBUTION CONSULTING, LLC, and files this, its Complaint against Defendant, FIDELITY & GUARANTY LIFE INSURANCE COMPANY. Plaintiff would respectfully show the Court as follows:

### I.

### Parties

1. Plaintiff, Insurance Distribution Consulting, LLC ("IDC" or "Plaintiff"), is a company of limited liability organized and existing under the laws of the State of Florida.

2. Defendant, Fidelity & Guaranty Life Insurance Company ("FIDELITY"), is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business at 801 Grand Avenue, Suite 2600, Des Moines, Iowa, 50309. FIDELITY may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701, as its agent for service because FIDELITY engages in substantial business in Texas but has not designated or maintained a resident agent for

service of process in Texas. Alternatively, FIDELITY may be served with process upon its registered agent for service of process in Iowa, C.T. Corporation System, 400 E. Court Ave., Des Moines, IA 50309.

## II.

## Jurisdiction

3.  This Court has federal question jurisdiction pursuant to 42 U.S.C. § 1981. This Court also has diversity jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000.00, excluding interest and costs.

4.  This Court has personal jurisdiction over FIDELITY because Plaintiff's cause of action arises out of or relates to FIDELITY's contacts with Texas. More specifically, Plaintiff is entitled to payments under a contract among Plaintiff, FIDELITY and Freedom Equity Group, LLC ("FEG"), a California, LLC whose member, Ronald Bloomingkemper resides in Galveston County. A large portion of the payments that are due and have been unpaid to Plaintiff arise out of FIDELITY's substantial business relationship with Texas residents in and around Texas. Plaintiff assisted FIDELITY in developing its relationship with FEG and is thus entitled to a percentage of the revenue that FIDELITY derives from its business with FEG. FIDELITY's relationship with FEG forms a substantial part of Plaintiff's claim.

5.  In October 2021, FIDELITY acquired a 30% interest in FEG. FIDELITY's breach of contract and other tortious conduct resulted in several million dollars of lost revenue to Plaintiff, all stemming from FIDELITY's failure to account to Syncis Holdings,

LLC ("Syncis"), and through Syncis to Plaintiff, for revenue owed for life insurance policy sales made by FEG.

6.      Furthermore, FIDELITY recognizes that Texas ranks third among all states in FIDELITY'S retail sales. The top five states account for 37% of all such sales. In 2022, for example, FIDELITY reported nearly $1.7 billion in life insurance sales revenue.

7.      In sum, FIDELITY purposefully avails and has availed itself of the privilege of conducting business in the State of Texas, including without limitation through its relationship with FEG and its sales of retail products in Texas, thus invoking the benefits and protections of the laws of Texas, as more fully described below.

## III.

## Venue

8.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. As discussed above, a large part of Plaintiff's claim arises out of FIDELITY's failure to pay Plaintiff its percentage share of revenue generated by FEG.

## IV.

## Conditions Precedent

9.      All conditions precedent to the claims sought here have been performed, have occurred, or will have occurred.

## V.

## **Facts Applicable to All Actions**

10. Plaintiff seeks damages because of FIDELITY's failure to account to Plaintiff for revenue owed on commissions for life insurance sales under various agreements, as more fully described below and in Plaintiff's causes of action. Plaintiff also seeks compensation based upon FIDELITY's discrimination in contracting with Plaintiff, a Black-owned business.

11. Insurance carriers, like FIDELITY, make money when insurance agents and independent marketing organizations (IMOs) and their down-line insurance agents and marketing organizations market and sell a carrier's insurance and annuity products.

12. IMOs consist of networks of independent insurance agents and other marketing companies that exist down-line from the IMO. IMOs often contract to sell insurance policies to the public through a network of down-line insurance agents. IMOs gain strength in the marketplace by recruiting insurance agents to become part of their down-line sales force. They also recruit other insurance marketing organizations to sell insurance policies offered by the insurance carriers that IMOs represent. IMOs earn a share of commissions from their down-line insurance agents and marketing organizations' insurance product and annuity sales.

13. FIDELITY offers both life insurance and annuity products to consumers, usually through IMOs and independent insurance agents or marketing organizations.

14. IDC performs consulting services for IMOs, including: connecting IMOs with insurance carriers; organizing IMO business strategies to maximize insurance policy

and annuity sales; deciphering insurance carrier's actuarial models for IMOs to assist IMOs in negotiating better commission rates from insurance carriers; engaging in regular consultations with the IMOs to advise them about revenue generation strategies and insurance carrier relations; keeping IMOs in compliance with insurance regulations; creating back offices so that earned commissions could be distributed by IMOs to itself and its downstream insurance agents efficiently; checking insurance company payments to ensure that IMOs received earned commissions from carriers; and performing various and sundry consultation services for IMOs. These services on behalf of IMOs will be referred to as IDC's Business Plan.

15.     IDC worked with two separate IMOs, Syncis (formerly known as Synergy) and FEG to implement IDC's Business Plan. In exchange for IDC's Business Plan, Syncis and FEG agreed to pay IDC overrides based on the difference in value that IDC was able to generate for its IMO clients' commissions over and above industry standards.

16.     IDC connected two IMOs, Syncis and FEG, with FIDELITY and developed avenues for revenue generation that neither IMO had been able to establish for themselves by selling FIDELITY's life products.

17.     For Syncis, IDC was able to establish a direct relationship between Syncis and FIDELITY, including the payment of commissions on insurance sales well more than industry norms. In exchange for IDC's Business Plan (including these higher commission rates) on behalf of Syncis, IDC was entitled to receive overrides on Syncis' commissions resulting from the sale of FIDELITY products.

18. For FEG, which was deemed by FIDELITY to be undesirable and unworthy of a direct relationship with FIDELITY to sell its life insurance products, IDC was able to connect FEG to FIDELITY through Syncis. FEG became a down-line IMO under Syncis' umbrella. IDC's Business Plan for FEG worked, and IDC was able to connect FEG to FIDELITY through Syncis' contract with FIDELITY. As a down-line IMO under Syncis, IDC opened the door for FEG to market FIDELITY life insurance products, something that FEG could not do for itself.

19. The result of IDC's connection of both FEG and Syncis to FIDELITY worked marvelously long-term for FIDELITY and FEG; however, Syncis and IDC's revenues never reached the level of success that would be expected through their relationship with FIDELITY. FIDELITY worked with FEG to deprive both Syncis and IDC of their value expectations from FEG's insurance sales.

20. These value expectations fell short because FIDELITY usurped the opportunity Syncis and IDC created for FEG. FIDELITY: (1) breached its agreement with Syncis and IDC; (2) breached its agreement with FEG and IDC; and (3) interfered with the agreement among IDC, Syncis and FEG (the Multi-Party Distribution Agreement), by prying FEG away from IDC and Syncis. Moreover, this "Multi-Party Distribution Agreement", which FEG unsuccessfully attempted to terminate on September 18, 2020, exists to date because FEG failed to cancel this agreement consistent with its policy to have its three principals sign any such termination, which never happened.

21. Instead of allowing the parties to remain operating under this Multi-Party Distribution Agreement, FIDELITY convinced FEG to go "direct" with FIDELITY and pried FEG from its contract with Syncis and IDC.

22. FIDELITY, operating by and through its authorized agents and employees, specifically John Phelps and Dennis Sudac, orchestrated this takeover of Syncis' and IDC's contractual relationship with FEG, and brought FEG directly into FIDELITY's fold. Phelps also urged or instructed FEG to employ Sudac. Phelps had been Sudac's supervisor at FIDELITY. FEG agreed to employ Sudac. By having Sudac in place at FEG, FIDELITY could ensure that despite the loss of Syncis and IDC's Business Plan, FEG could remain successful. Embedding Sudac with FEG also kept FEG close to FIDELITY and Phelps. This allowed FIDELITY to reduce Syncis' book value by eliminating FEG's significant FIDELITY product sales (and commissions) from Syncis' revenue stream, making it less expensive for FIDELITY to acquire a 49% interest Syncis, which it eventually did at the end of 2022. Sudac's placement into FEG's business also served to fortify FEG's relationship with FIDELITY and allowed FIDELITY to acquire a 30% interest FEG as well, in October 2021.

23. At the time FIDELITY interfered with Syncis' and IDC's contractual and economic relationship with FEG, FEG had grown to develop relationships with about 4000 insurance agents and marketing organizations. FIDELITY's acts, by and through Sudac and Phelps' illegal plan, harmed Syncis which in turn caused serious IDC serious financial damages. IDC seeks to recover from FIDELITY its lost revenues and damages.

24. Before these events, FIDELITY had established a longstanding, preexisting

relationship of trust and confidence with IDC. IDC introduced FIDELITY to Syncis. Moreover, FIDELITY provided accounting services that paid Syncis and IDC (through Syncis) for commissions owed to them. These accounting services and functions were exclusively within FIDELITY's control and allowed FIDELITY to manipulate its agreements, as it did here. Once FIDELITY made a direct relationship with FEG, it stopped paying Syncis commissions owed for vested life insurance commissions flowing from FEG's sales of FIDELITY life insurance products, even though the Multi-Party Distribution Agreement was never properly terminated. FIDELITY continuously violated (and continues to do so now) and interfered with the Multi-Party Distribution Agreement, in violation of fiduciary duties it owed to IDC.

25. After FIDELITY acquired Syncis at the end of 2022, IDC offered to sell IDC's interests in its contract with Syncis to Syncis on March 1, 2023. By way of background, IDC's contract with Syncis calls for payment from Syncis as consideration for IDC's Business Plan. In short, IDC is entitled to receive overrides on Syncis' commissions based on sales Syncis' IMO made of FIDELITY insurance and annuity products.

26. FIDELITY already had purchased interests in FEG and Syncis. IDC's offer to sell these interests requested the same valuations as made for FIDELITY's purchase of Syncis (subject to the difference between IDC's override value as compared to Syncis' commission rates). Purchasing IDC's right to payment from Syncis makes the same good business sense as FIDELITY's purchase of interests in FEG and Syncis, with one exception: IDC is a Black-owned business and Phelps has always exhibited an anti-IDC

8

animus, especially for IDC's owner, Michael Jones. Mr. Jones, an insurance actuary, is Black and of Jamaican heritage.

27. In response, to IDC's inquiry to purchase its interests in IDC's contract with Syncis, Phelps wrote on March 24, 2023: "I am in in receipt of your letter dated March 1, 2023 whereby Insurance Distribution Consulting, LLC ("IDC") made an offer to F&G Annuities & Life, Inc. ("F&G") to sell its interest in a Distribution Consulting Agreement, as amended, between Syncis and IDC. I have considered your proposal; however, F&G is not interested in pursuing the proposed transaction at this time."

28. IDC sent a follow-up letter to FIDELITY on March 31, 2023: "We received your response to IDC's inquiry of potential purchase by F&G of its contract with Syncis, in which F&G indicated it is not interested at this time, as well as F&G's adherence to confidentiality. Please let us know if and when F&G might be ready to purchase IDC's contract with Syncis. Additionally, since F&G now owns a large portion of Syncis and will likely be more involved in its operations, we want to reaffirm the methodology and formula used for IDC distribution that has been in place through year 2022 and up to the time of F&G's purchase of a large portion of Syncis."

29. FIDELITY failed to respond to this letter. However, FEG has tried to obtain releases on behalf of FIDELITY from IDC based upon an unrelated lawsuit Insigne Consulting, Inc. filed against FEG in California. Again, FEG and FIDELITY were working together, this time to improperly absolve FIDELITY from its discrimination in contracting with IDC.

30. FIDELITY'S Board of Directors and Executive Committee are devoid of any

Black members. There appears to be only one person of color on its Executive Committee. FIDELITY's 2022 Annual Report strangely emphasizes that FEG's and Syncis' focuses on "cultural markets" including Mexican-American, Hmong, Laotian, Filipino, Burmese, Congolese-American, Samoan, African-American, Thai, Vietnamese, Korean and Persian, as if to say FIDELITY is inclusive. FIDELITY's Board and Executive Committee's composition truly speaks to what FIDELITY's racial preferences are; its discrimination in failing to contract with IDC proves its true anti-Black animus.

## VI.

## Causes of Action

### Cause 1: Breach of Contract

**1. There is a valid, enforceable contract.**

31. IDC entered a valid, enforceable agreement made among IDC, FEG and FIDELITY on or about October 18, 2014. The agreement was never cancelled by any party to it. This agreement provides for FIDELITY's payment of commissions for FEG sales. FIDELITY accepted this agreement and the benefits provided by it, including receipt of hundreds of millions in life insurance policy and annuity sales.

**2. The plaintiff is a proper party to bring suit for breach of the contract.**

32. IDC was a signatory of this agreement and is a party to it.

**3. The plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.**

33. Plaintiff performed its obligations under the agreement, including indemnification of FIDELITY for chargebacks incurred by FEG and the provision of IDC's

Business Plan for FEG.

**4. The defendant breached the contract.**

34. FIDELITY failed to pay IDC commissions for policies sold by FEG and usurped the opportunity IDC created for FIDELITY by making a direct relationship with FEG and thereby carving IDC out of the agreement's benefits. FIDELITY continues to breach its agreement on a monthly basis by failing to pay commissions and overrides to IDC.

**5. The defendant's breach caused the plaintiff injury.**

35. Plaintiff incurred substantial economic loss and continues to suffer substantial economic loss because of FIDELITY's failure to account to IDC for the sums it earned on its vested interest in the FIDELITY products that FEG sold, for which sum IDC hereby seeks from FIDELITY.

## Cause 2: Breach of Fiduciary duty

**1. The plaintiff and defendant had a fiduciary relationship.**

36. IDC had a preexisting, long-term relationship of trust and confidence with FIDELITY. Moreover, FIDELITY possessed the sole means to account to IDC through Syncis for proceeds owed under the parties' contract with FEG. FIDELITY knew that IDC relied upon FIDELITY to provide this information, and IDC did so rely. Still FIDELITY elected not to share its information with IDC once it acted to create a direct relationship with FEG. These factors all created a special relationship between FIDELITY and IDC, and the incumbent fiduciary responsibilities between them.

**2.      The defendant breached its fiduciary duty to plaintiff.**

37.     FIDELITY breached the duties of loyalty, non-self-dealing, and candor it owed IDC by failing to provide it (and Syncis) with information about sums owed for their vested interests in FEG's insurance policy sales and resulting commissions owed to IDC.

**3.      The defendant's breach: (1) proximately caused injury to the plaintiff; or (2) resulted in a benefit to the defendant.**

38.     IDC suffered damages proximately caused by FIDELITY's breach of fiduciary duties, for which sum IDC hereby sues.

39.     Alternatively, FIDELITY's breach resulted in substantial benefits to FIDELITY. First, FIDELITY paid far less value to Syncis for its acquisition of 49% of it. If FEG had remained under Syncis, Syncis would have been worth far more money. Second, FIDELITY carved Syncis and IDC out of its expectancy from its Multi-Party Distribution Agreement with FEG. In the alternative to recovery of damages, FIDELITY should be disgorged of these benefits.

40.     IDC should be allowed to elect its remedy based upon these two alternative damages theories based upon FIDELITY's wrongdoing.

### Cause 3:  Fraud

**1.      The defendant made a representation to the plaintiff.**

41.     FIDELITY, by and through its employees and authorized agents, represented that Syncis and IDC would benefit by sponsoring FEG as a down-line IMO.

**2.      The representation was material.**

42.     FIDELITY'S representation was material to IDC's decision to provide IDC's

12

Business Plain to FEG.  FEG had developed a poor industry-wide reputation based upon its involvement in: a) selling mortgage-backed insurance policies and the lawsuits that resulted from doing so; b) deceptive debt reduction programs; and c) SBA loans.  IDC also stood up for FEG by providing its principal's personal guarantee that FEG would make good for any chargebacks.  IDC would not have done so if it knew that its sponsorship of FEG would result in FIDELITY's plan to usurp FEG from IDC's control and deny IDC the very benefits promised to it.

**3. The representation was false.**

43. FIDELITY falsely represented that IDC would benefit by sponsoring FEG. Instead, FIDELITY enacted a plan to take all benefits of FEG's production for itself once FEG proved its mettle, as IDC assured FIDELITY that it would.

**4. When the defendant made the representation, the defendant: (a) knew the representation was false, or (b) made the representation recklessly, as a positive assertion, and without knowledge of its truth.**

44. As borne out by its actions, FIDELITY knew that its representation was false or made the representation recklessly, as a positive assertion, without knowledge of its truth.

**5. The defendant made the representation with the intent that the plaintiff act on it.**

45. FIDELITY made its representation with the intent that IDC would act on it. Fidelity knew that FEG was not worthy to be in a direct relationship with it.  IDC reasonably thought that based upon FEG's principal's drive to succeed, they would become successful.  But, to invest in the business by providing IDC's Business Plan to FEG and

13

turn it around, IDC needed FIDELITY's promise that a beneficial relationship would result. FEG's status as an industry pariah required FIDELITY's promise of a benefit to IDC for IDC to act. FIDELITY did just that.

**6.    The plaintiff relied on the representation.**

46.    IDC relied upon FIDELITY's promise of a benefit to provide IDC's Business Plan to FEG, and to guaranty FEG's obligations to FIDELITY. FIDELITY provided products and its company's good credit rating to encourage IDC to undertake a reversal of FEG's fortune.

**7.    The representation caused the plaintiff injury.**

47.    Despite FIDELITY's assurance of benefits to IDC from FIDELITY's relationship with FEG, FIDELITY took FEG "direct" and eliminated Syncis and IDC's ability to receive revenue from FEG's sales of FIDELITY products. FIDELITY's efforts in these regards caused IDC significant damages.

**Cause 4:  Intentional Interference with Contractual and Economic Relations.**

**1.    The plaintiff had a valid contract.**

48.    IDC has/had a valid contract between and among FEG, Syncis and IDC, the Multi-Party Agreement. Under this contract, IDC's compensation was determined by its Agreement with Syncis.

**2.    The defendant willfully and intentionally interfered with the contract.**

49.    FIDELITY willfully and intentionally interfered with the Multi-Party Agreement by going "direct" with FEG.

**3.    The interference proximately caused the plaintiff's injury.**

50. FIDELITY'S interference eliminated IDC's right to receive overrides through FEG's sales of FIDELITY products and resulting commissions, proximately causing IDC to suffer significant damages.

**4. The plaintiff incurred actual damage or loss.**

51. Since IDC no longer receives any overrides based on FEG's insurance sales and resulting commissions, IDC has incurred actual damages and revenue losses.

### Cause 5: Conspiracy.

52. The defendant was a member of a combination of two or more persons. FIDELITY was a member of a combination of two or more persons, those persons being FEG and FIDELITY.

53. The object of the combination was to accomplish (b) an unlawful purpose or (a) a lawful purpose by unlawful means.

54. The members had a meeting of the minds on the object or course of action.

55. One of the members committed an unlawful, overt act to further the object or course of action.

56. IDC suffered injury as a proximate result of the wrongful act.

### Cause 6: Violation of 42 U.S.C. 1981.

57. IDC, as a Black-owned business, is a member of a racial minority. FIDELITY had an intent to discriminate on the basis of race. FIDELITY's discrimination concerned IDC's ability to make and perform contracts, as described above. IDC's inability to make and perform a contract with FIDELITY, the purchase of IDC's interests in its contract with Syncis, caused IDC damages.

## VII.

### **Damages**

58. IDC estimates that the amount that FIDELITY was obligated but failed to pay to IDC through Syncis totals approximately $5,035,000.00 for payments that should have been made in the period from July 1, 2019, and prior to January 1, 2023. Based on historical and current trends in the marketplace and using the market comparison methods used by FIDELITY for its acquisition of IMOs with very similar income streams as those of IDC, IDC estimates that it would have earned $24,600,000.00 in payments from FIDELITY from January 1, 2023, and into the future, if not for FIDELITY's wrongful conduct as described herein. Additionally, the fair market value for the purchase of IDC's rights to payment from FIDELITY through its relationship with Syncis is in excess of $8,400,000.00.

## VIII.

### **Punitive/Examplary Damages**

59. Because FIDELITY committed the complained of acts with malice or reckless indifference to Plaintiff's federally protected rights, Plaintiff seeks an award of punitive damages.

60. Because FIDELITY acted with fraud and malice, Plaintiff seeks exemplary damages on its state law claims as permitted by Tex. Civ. Prac. & Rem. Code § 41.003.

## IX.

### **Attorneys'and Experts' Fees**

61. As a result of FIDELITY's conduct described above, Plaintiff retained

undersigned counsel to represent Plaintiff in this action. Plaintiff is entitled to an award of reasonable and necessary attorneys' fees and costs under Tex. Bus. & Com. Code Chapter 38 and 42 U.S.C § 1988. Plaintiff also seeks its expert fees as permitted by 41 U.S.C. § 1988.

## X.

## Jury Demand

62.  Plaintiff demands a trial by jury.

## XI.

## Prayer

By reason of the above and foregoing, Plaintiff prays for a judgment against Defendant for the following:

a.  Actual damages;

b.  Punitive and exemplary damages;

c.  Prejudgment and postjudgment interest;

d.  The reasonable and necessary attorneys' fees and expert fees incurred by Plaintiff;

e.  Costs of suit; and

f.  All other relief the Court deems appropriate.

Respectfully submitted,

**O'CONOR, MASON & BONE, P.C.**

By:   /s/ *Robert D. O'Conor*
      **ROBERT D. O'CONOR**
      Fed. I.D. No. 13014
      State Bar No. 15191250
      **J. KEVIN RALEY**
      Fed. I.D. No. 36982
      State Bar No. 24041742

Of Counsel:

**O'CONOR, MASON & BONE, P.C.**
1616 S. Voss, Suite 200
Houston, Texas 77057
Telephone: (713) 647-7511
Facsimile: (713) 647-7512
Email: boconor@ombtxlaw.com
       kraley@ombtxlaw.com